**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 2:14-cv-00007-MR-DLH**


| | |
|---|---|
| **DIAMOND FALLS ESTATES, LLC,** ) | |
| **SHIRLEY M. BUAFO and CHARLES** ) | |
| **K. BUAFO,** ) | |
| ) | |
| **Plaintiffs/** ) | |
| **Counter-Defendants,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **NANTAHALA BANK & TRUST** ) | |
| **COMPANY, STEVE E. GRAVETT,** ) | |
| **EXCELL PARTNERS, LLC, LUXUR,** ) | |
| **INC., REALTY ACQUISITIONS, LLC,** ) | |
| **and JOHN/JANE DOES,** ) | |
| ) | |
| **Defendants/** ) | |
| **Counter-Plaintiffs.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on Plaintiffs' Motion for Partial
Summary Judgment [Doc. 77]; Defendant Nantahala Bank & Trust
Company's Motion for Summary Judgment on Nantahala's Amended
Counterclaims [Doc. 95]; Defendant Nantahala Bank & Trust Company's
Motion for Summary Judgment on Plaintiffs' Third Amended Complaint [Doc.
98]; Plaintiffs' Motion to Exclude Certain Opinion Testimony of Roy

Strickland [Doc. 102]; and Defendant Nantahala Bank & Trust Company's Motion in *Limine* to Exclude Plaintiffs' Damages Expert [Doc. 104].

## I. PROCEDURAL BACKGROUND

On December 27, 2013, the Plaintiffs Diamond Falls Estates, LLC ("DFE"), Shirley M. Buafo, and Charles K. Buafo initiated this action against the Defendant Nantahala Bank & Trust Company (the "Bank") in the General Court of Justice, Superior Court Division, for Macon County, North Carolina, asserting various claims arising from a real estate acquisition and development loan made by the Bank to the Plaintiffs.[1] [Doc. 1-1]. The action was removed to this Court on February 21, 2014. [Doc. 1].

In their Third Amended Complaint, the Plaintiffs assert a total of eight causes of action against the Bank, including claims for: (1) breach of contract/breach of covenant of good faith and fair dealing ("Count Two"); (2) breach of fiduciary duty ("Count Three"); (3) negligent/fraudulent misrepresentation ("Count Four"); (4) unfair and deceptive trade practices ("Count Five"); and (5) constructive fraud ("Count Nine"). Additionally, the

---

[1] The Plaintiffs also brought suit against Steve E. Gravett, Excell Partners, LLC, Luxur, Inc., Realty Acquisitions, LLC, and an unidentified number of "John/Jane Does." The Plaintiffs never obtained service on or identified any of the John Doe or Jane Doe Defendants, and they subsequently dismissed their claims against Steve E. Gravett, Excell Partners, LLC, Luxur, Inc., and Realty Acquisitions, LLC. [Doc. 100]. Thus, the only remaining defendant in this action is Nantahala Bank & Trust Company.

Plaintiffs seek declaratory and injunctive relief ("Count Six" and "Count Eight," respectively) and assert a claim for punitive damages ("Count Seven"). [Doc. 64]. The Bank filed an Amended Answer denying all of the Plaintiffs' claims and asserting counterclaims for recovery under the note as well as under the personal guaranties executed by the Buafos, and for an award of attorneys' fees under both the note and the guaranties. [Doc. 75]. The Plaintiffs filed a Reply to the Bank's Amended Counterclaims, asserting various affirmative defenses, including a defense that the Bank's Amended Counterclaims are barred, in whole or in part, by the Bank's breach of contract (the "Eighth Affirmative Defense"). [Doc. 76].

The Plaintiffs now seek partial summary judgment on Counts Two, Three and Nine of their Third Amended Complaint, as well as their Eighth Affirmative Defense to the Bank's Amended Counterclaims. [Doc. 77]. The Bank, in turn, seeks summary judgment with respect to all of the claims asserted in the Third Amended Complaint, as well as its Amended Counterclaims for recovery under the note and personal guaranties. [Docs. 95, 98]. Additionally, the Plaintiffs and the Bank have filed motions to exclude and/or limit certain opinions proffered by the opposing side's expert witnesses. [Docs. 102, 104]. Signed: September 7, 2015

Having been fully briefed                                              n.

Martin Reidinger
United States District Judge

## II.    STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the case."  N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record.    Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists.  Id.

When the parties each move for summary judgment on the same claim, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of

4

law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).  In considering each of the motions for summary judgment, the Court must view the pleadings and materials presented in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor as well.  Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.    FACTUAL BACKGROUND

The operative facts in this matter are not in dispute.  Where there is any material conflicting evidence, it is noted below.

### A.    The Plaintiffs Acquire the Property

The property at issue is a tract of real property consisting of 283.40 acres in Franklin, North Carolina (hereinafter the "Property").    [Third Amended Complaint ("TAC"), Doc. 64 at ¶ 3; Bank's Amended Answer and Counterclaims ("Am. Answer"), Doc. 75 at ¶ 13].   In February 2007, the Plaintiffs Shirley M. Buafo ("Ms. Buafo") and Charles K. Buafo ("Dr. Buafo") (collectively, the "Buafos") formed a limited liability company called Pembroke Heights, LLC ("Pembroke") for the purpose of purchasing and developing the Property into a residential subdivision called Diamond Falls Estates.  The Buafos funded Pembroke by making a $1.3 million cash capital contribution, each taking a 22.5% membership interest in the newly formed

LLC.  The Buafos also gave their daughter, Althea Buafo (now deceased), a 25% membership interest, and they gave the remaining 30% interest to a friend, Yaw Pare ("Pare").  The Buafos then acted through Pembroke to purchase the Property from West Ridge Land, LLC ("West Ridge") for $3.5 million, executing a $2.75 million promissory note to West Ridge and paying cash for the balance. [Deposition of Shirley Buafo ("S. Buafo Dep."), Doc. 80-4 at 150-56, 160; S. Buafo Dep., Doc. 99-1 at 27; Plaintiffs' Reply to Counterclaims, Doc. 76 at ¶ 188].

After closing on the Property, the Buafos began their development efforts.  Ms. Buafo, however, quickly became dissatisfied with those efforts when she discovered that Pare was working with a partner, that the two were diverting money from the Project to themselves, and that a finder's fee of approximately $300,000 had been paid to Pare and others in connection with the sale of the Property.  Ms. Buafo also became worried about the financing arrangement with West Ridge, believing that West Ridge was trying to trick her into a default situation so that it could get the Property back.  [S. Buafo Dep., Doc. 80-4 at 156-76; S. Buafo Dep., Doc. 99-1 at 23-26].

To help her address these concerns, one of Ms. Buafo's advisers introduced her to James VanderWoude, a local real estate investor. VanderWoude was also one of the founders of the Bank, and has served

since its formation as a director and Chairman of the Board. [Deposition of James VanderWoude ("VanderWoude Dep."), Doc. 80-4 at 11-14, 38-39; S. Buafo Dep., Doc. 80-4 at 169, 173].

During his meeting with Ms. Buafo, VanderWoude told her: "if you get Steve Gravett to develop the land, I will finance it for you." Ms. Buafo testified that VanderWoude made this commitment despite the fact that she showed him no financial statements or other financial documentation. [S. Buafo Dep., Doc. 80-4 at 177, 182]. VanderWoude, on the other hand, testified there were no discussions regarding financing or lending at that first meeting. Instead, VanderWoude says that he understood that the Buafos wanted him to take over the Project. Vanderwoude testified he was not interested in managing the Project for the Buafos. VanderWoude further testified that he warned the Buafos to think carefully before they continued with their plans because he believed the economy was bad right then for real estate development. Ms. Buafo denied that VanderWoude ever warned her against undertaking the Project due to the economy. Regardless of the differences in their testimony concerning the purpose of the first meeting and what was said, both VanderWoude and Mrs. Buafo testified to essentially the same outcome of that meeting: VanderWoude referred the Buafos to Steve Gravett as a person he recommended if they wanted help with managing the Project.

[S. Buafo Dep., Doc. 80-4 at 177-82, 188-91; VanderWoude Dep., Doc. 80-4 at 40-43, 51-54].

Gravett owned several businesses and provided consulting and land development services. He and VanderWoude had worked with each other in the past on various real estate projects. Additionally, Gravett's consulting business, Luxur, Inc., became a Bank shareholder through its profit sharing plan in February 2007. Gravett is the trustee of the Luxur profit-sharing plan.

Ms. Buafo contacted Gravett by phone almost immediately after her meeting with VanderWoude. Ms. Buafo had several more telephone conversations with Gravett, which were followed by an in-person meeting. Within a short time thereafter, Gravett and the Buafos had entered into a Consulting Agreement. [Steve Garrett Dep., Doc. 80-2 at 72-74, 80-85; VanderWoude Dep., Doc. 80-4 at 40-41; S. Buafo Dep. Doc. 80-4 at 182-95; Gravett Letter dated 12/11/11, Doc. 80-5 at 8-11; Consulting Agreement, Doc. 80-5 at 12-19].

## B. The Original Note

Gravett immediately began addressing the issues that had arisen with the Buafos' earlier attempts to develop the Property. One issue was how to get rid of Pare, who still held an ownership interest in Pembroke. Either Gravett or the Buafo's attorney suggested that the Buafos form a new limited

liability company. The Buafos would then have Pembroke sell the Property to the new company. In accordance with this plan, the Buafos organized Diamond Falls Estates, LLC ("DFE") on or about February 18, 2008. The sole members of DFE were the Buafos and their daughter Althea. [Bank's Amended Counterclaims, Doc. 75 at ¶¶ 189-90; S. Buafo Dep., Doc. 80-4 187-88, 210-11; DFE Articles of Organization, Doc. 99-11]. Althea Buafo passed away on October 20, 2009. [See Settlement Agreement and Release, Doc. 99-14].

Next, Gravett and the Buafos worked on refinancing the West Ridge promissory note. Ms. Buafo testified that it was her idea to seek refinancing, because she felt uncomfortable with a seller-financed arrangement and wanted to deal instead with an independent lending institution. When the Buafos asked VanderWoude about a loan, he referred them to the Bank's Chief Credit Officer. Ultimately, this referral led to the initial loan from Bank ("the February 28, 2008 Loan"), the purpose of which was to refinance the West Ridge promissory note. The borrower under the February 28, 2008 Loan was the newly formed company, DFE. Upon closing, Ms. Buafo executed documents causing Pembroke (1) to transfer title to the Property from Pembroke to DFE in exchange for the funds DFE obtained from the Bank, and (2) to use those funds to satisfy the West Ridge note. [S. Buafo

Dep., Doc. 80-4 at 174-75, 188, 210-11, 214-15; VanderWoude Dep., Doc. 80-4 at 43, 44; Am. Answer, Doc. 75 at ¶¶ 192-95; Promissory Note dated 2/28/2008, Doc. 99-16; 2008 General Warranty Deed, Doc. 7-5].

Even before the February 28, 2008 Loan had closed, Gravett was in discussions with the Bank on behalf of DFE for a new loan package to include money not only to refinance the original acquisition of the Property but also to fund the development of Phase One of the Project ("the Development Loan"). Because of the anticipated size of the Development Loan, the Bank was working to bring another local bank in on the deal. [Deposition of Russell Hawkins ("Hawkins Dep."), Doc. 91-1 at 62-63]. The loan officer assigned to DFE recommended to the Bank that the loan request be approved based not only on "the proven experience from the overseeing developer [Gravett]," but also on "the financial strength of the guarantor [Dr. Buafo]." [Loan Officer Recommendation, Doc. 91-1 at 384-88].

On March 26, 2008, the Loan Committee approved the Development Loan. On March 28, 2008, Bank issued a Commitment Letter to DFE offering them a commitment to loan DFE a maximum of $4,780.935.00 for the purpose of refinancing the February 28, 2008 loan and for the purpose of developing the Property. The Commitment Letter states that the "[m]aximum loan amount is to include a $240,000 interest reserve, $1,790,935 for

development costs and $2,750,000 to refinance existing acquisition loan." [2008 Commitment Letter, Doc. 91-1 at 380]. The Commitment Letter further provides that: **"**A release provision of 95% of net sales proceeds with a minimum principal reduction of $35,000 per acre will apply for deed releases." (the "Release Provision"). [Id. at 381]. The Commitment Letter also states, in pertinent part, that: "[t]he provisions of this commitment shall survive the closing of the loan and shall not be merged into any of the loan documents. If any terms herein are inconsistent with those of the loan documents, the term of the loan documents shall control." (the "Survival Provision"). [Id. at 384].

In April 2008, at Gravett's instruction, the Buafos elected Gravett as a non-member manager of DFE, which gave him the rights as General Manager of DFE. [DFE Minutes dated 4/10/08, Doc. 80-5 at 17-19].

On May 28, 2008, DFE executed a promissory note (the "Original Note") in the principal amount of $4,780,935.00 in favor of the Bank. [Original Note, Doc. 7-1]. The Original Note had a maturity date of May 28, 2011. [Id.]. As collateral for the loan, DFE pledged and the Bank obtained a Deed of Trust against the Property. [TAC, Doc. 64 at ¶ 21; Am. Answer, Doc. 75 at ¶ 21].

The Development Loan provided for an initial advance of $2,761,782.98 to pay off the February 28, 2008 Loan. Future draws were permitted to fund development expenses going forward, capped at a total outstanding loan balance of $4,780,935.00. [Am. Answer, Doc. 75 at ¶¶ 196-97; Commitment Letter, Doc. 75-1; Loan Officer Recommendation, Doc. 91-1 at 384-89; Original Note, Doc. 7-1].

In January 2009, DFE sold the first lot in the development. In connection with that sale, the Bank accepted a lower than contractually required release amount and then modified the Release Provision going forward to reflect a different formula. This occurred as a result of the fact that the formula specified in the Release Provision relies on a "net" loan proceeds calculation (95% of net proceeds), requiring the loan officer to estimate prior to closing what the release fee will be. For the first closing, the loan officer's estimate turned out to be low, but approval was given to allow the transaction to close based on the pre-estimate amount, rather than to require that the closing be delayed. To avoid this problem going forward, the loan officer submitted a change request to the Loan Committee for an adjustment to the release fee formula to 85.5% of the *gross* proceeds. This adjustment was approved by the Loan Committee. [Hawkins Dep., Doc. 91-1 at 90-103; Loan

Committee Minutes, Doc. 91-1 at 418; Second Affidavit of Clara Reffit ("Reffit Aff. #2"), Doc. 99-7 at ¶¶ 6-8].[2]

The Project began to experience financial difficulties in the early part of 2009 due to cost overages. These issues persisted through May 2009, when the Bank froze funding under the Development Loan due to expense overruns. As a result of the Bank's freeze on funding, the Buafos had to inject their own funds into the Project. The Project continued to experience financial difficulties through the fall of 2009, and by November 2009, the interest reserve funded at the closing of the Development Loan was depleted. The Buafos once again had to inject additional equity into DFE to fund the interest payments. [Hawkins Dep., Doc. 91-1 at 127-29, 253; DFE Timeline, Doc. 99-12].

On January 28, 2010, DFE entered into a Debt Modification Agreement (the "First Modification") concerning the Original Note, which decreased the interest rate from 5.5 to 5.0 percent. [First Modification Doc. 7-2].

---

[2] This modified formula was never actually used because the only lot sales which occurred after January 2009 took place in connection with the October 2010 Sales Event, which is discussed infra. [Reffit Aff. 2, Doc. 99-7 at ¶ 9].

## C. The Sales Event

In late spring and/or early summer of 2010, concerns with the Project shifted from cost overruns to lackluster lot sales.[3] To address this problem, Gravett, on behalf of DFE, entered into a Marketing Agreement with a company called RPM Group LLC ("RPM"), which was to hold an "event sale" for Phase One of the Property ("the Sales Event"). [Gravett Letter dated 12/11/11, Doc. 99-22; Gravett Dep., Doc 80-2 at 125-32; RPM Marketing Agreement, Doc. 43-4]. The RPM Marketing Agreement originally provided that RPM was to receive 100% of the net sale proceeds up to $425,000.00 to reimburse it for its marketing fees, and after that, RPM was to receive up to a 29.75% commission if less than 50% of the lots sold and 33% if more than 50% of the lots sold.[4]

Gravett did not disclose the RPM Agreement to the Bank. [Gravett Dep., Doc. 80-2 at 154, 158]. When the Bank found out about the RPM Agreement shortly before the Sales Event, it objected to its compensation

---

[3] In fact, between the date on which the Development Loan was entered into and the October 2010 Sales Event, DFE had sold only one lot in the subdivision. [Reffit Aff. #2, Doc. 99-7 at ¶ 6].

[4] A separate agreement between Gravett and RPM entered into about the same time provided that RPM was to pay Gravett's company, Realty Acquisitions, LLC, a 3% commission on every closed lot. Gravett, in fact, never collected any of the 3% commissions from RPM, as the company ended up filing for bankruptcy. [Gravett Dep., Doc. 80-2 at 159, 161-63].

terms, because they were inconsistent with the Bank's right to release fees. After some last-second negotiations between Gravett (on behalf of DFE) and the Bank, the Sales Event went forward. [RPM Agreement, Doc. 43-4; Gravett Dep., Doc. 80-2 at 135; Email chain between Hawkins and Gravett, Doc. 99-2].

The Sales Event was held on October 2, 2010, and Gravett considered it a huge success. [Gravett Letter dated 12/11/11, Doc. 99-22; Gravett Dep., Doc. 80-2 at 132]. The Buafos attended the Event, and, in fact, Ms. Buafo signed some of the lot sale contracts personally. [S. Buafo Dep., Doc. 80-4 at 282].

While the Sales Event was successful in terms of the number of lots sold, many of the lots had been sold below the minimum prices to which the Bank had agreed prior to the event (which prices themselves were lower than the original sale prices). This meant lower release fees for the Bank than it had anticipated, calling into question whether certain loan-to-value ratios required by banking regulatory guidelines would be met. The parties worked through this problem by further negotiations with RPM, resulting in a Revised RPM Marketing Agreement. The new RPM Agreement provided for RPM to receive a 33% commission, but only $150,000 in marketing expenses reimbursements. [Affidavit #2 of Clara Reffit ("Reffit Aff. #2"), Doc. 99-7 at

¶¶ 14-15]. Additionally, the Bank accepted release fees far lower than the 95% of net sales proceeds contemplated by the 2008 Commitment Letter. [See Lot Release Schedule, Doc. 80-3 at 33].

On October 29, 2010, DFE held a meeting of the Members and Managers to discuss, among other items, the circumstances surrounding the Sales Event. The minutes of that meeting show that Gravett brought the Buafos up to date on financial matters and on-going business generated by the Sales Event. Additionally, the Revised RPM Marketing Agreement was presented to the Buafos for their signature. Gravett gave a detailed account of how the new agreement came to be and the benefits derived from the lowered up-front cash marketing fee. In addition, the Buafos executed Meeting Minutes expressly approving and ratifying all contracts and acts of its Managers since the April 10, 2008 meeting. [DFE Minutes dated 10/28/10, Doc. 99-23].

D. **The Buafos Terminate Gravett**

Shortly after this meeting, the Buafos terminated Gravett's consulting contract. Ms. Buafo noted in her email, however, that she did so "with sadness," further stating:

> No one knew that the economy would be as it is. We have ran [sic] out of money, we are stressed out and burnt out. You were our rock when we were going

through my daughter[']s sickness and ultimately her death. You did a great job as a consultant with Diamond Falls Estates. You were very professional and knew what you were doing. We will surely miss working with you . . . .

[Email dated 11/29/10, Doc. 99-15; Gravett Dep., Doc. 80-2 at 202-03].

After Gravett was terminated, Ms. Buafo began negotiating directly with the Bank. While still struggling with the release fee issue which resulted from lower than expected lot sale prices, the Bank learned of an additional problem: there were several unpaid subcontractors who were threatening to put liens on the Property, which liens would have prevented some of the lot sales from closing, further affecting the continued viability of the Project. The only way to pay the subcontractors was to use funds that otherwise were required to go to release fees. If the Bank made any further concessions on the release fees, however, the loan-to-value ratio for the Development Loan would have ceased to comply with applicable banking regulations. [Reffit Aff. #2, Doc. 99-7 at ¶¶ 15-16; Reffit Dep., Doc. 80-1 at 457, 459].

E.    **The Florida Mortgage**

In order to prevent a default on the Development Loan, the Bank requested additional collateral. On December 17, 2010, DFE entered into a second Debt Modification Agreement (the "Second Modification") concerning the Original Note. [Second Modification, Doc. 7-3]. On December 17, 2010,

17

the Buafos provided the Bank with a mortgage on property they owned in Florida (the "Florida Mortgage"). [Florida Mortgage, Doc. 99-18; Reffit Aff. #2, Doc. 99-7 at ¶ 16; Reffit Dep., Doc. 91-1 at 467].

In the early part of 2011, further discussions were had between the Bank and Ms. Buafo over whether the Bank would provide any more funds for further development. The Development Loan was already fully funded. Negotiations were conducted in which the Bank offered to lend an additional $100,000.00, but Ms. Buafo never pursued the offer. [Reffit Aff. #2, Doc. 99-7 at ¶¶ 20-22].

### F.    The Renewal Note

On June 11, 2011, DFE and the Bank entered into a Renewal Note extending the due date on the Development Loan to June 10, 2014. [Renewal Note, Doc. 7-4]. The last payment under the Renewal Note was received by the Bank on or about September 20, 2013. [Reffit Aff. #2, Doc. 99-7 at ¶ 24]. The Plaintiffs filed this lawsuit on December 27, 2013. [Complaint, Doc. 1-1].

The following amounts are due and owing under the Renewal Note, as of March 27, 2015:

Principal      $2,513,325.62

Interest       $206,277.16

Late Fees   $6,386.64

**TOTAL        $2,725,989.42**

[Reffit Aff., Doc. 96-1 at ¶ 36].  Interest continues to accrue on the principal

amount due under the Renewal Note at a rate of 5.25% ($366.53) per day,

beginning on March 28, 2015.  [Id.].  DFE has failed to pay the principal and

interest amounts due under the Renewal Note.  [Id. at ¶ 25].[5]

The Bank currently is the current owner and holder of the Renewal

Note. [Id. at ¶ 27].  The Renewal Note is made payable to the Bank and has

not been endorsed, transferred, or assigned to a third party.  [Id. at ¶ 26].

### G.    The Guaranties

As part of these transactions, the Buafos each executed guaranties,

promising that they would pay any outstanding balances under the Original

Note, the First Modification, the Second Modification, and the Renewal Note.

[Shirley Buafo Original Guaranty, Doc. 7-8; Charles K. Buafo Original

Guaranty, Doc. 7-12; Notice and Consent to Modification by Guarantor dated

12/17/10, Doc. 7-9; Notice and Consent to Renewal by Guarantor dated

---

[5] While the Renewal Note is secured by real property collateral, the Bank has not sought
to foreclose on the real property collateral.  Instead, the Bank elected to bring suit on the
Renewal Note without waiving its foreclosure rights should it decide later to exercise those
rights.  [Reffit Aff., Doc. 96-1 at ¶ 24].

6/18/11, Doc. 7-10; S. Buafo Renewal Guaranty, Doc. 7-11; C. Buafo Renewal Guaranty, Doc. 7-13].[6]

The Buafos have failed to pay the amounts due pursuant to their guaranties. [Reffit Aff., Doc. 96-1 at ¶ 35].

## IV. DISCUSSION

### A. Choice of Law

As a federal court sitting in diversity, this Court must apply the substantive law of the forum state, including its choice of law rules. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). For contractual claims, North Carolina courts generally apply the law of the place where the contract was made. See Norman v. Tradewinds Airlines, Inc., 286 F.Supp.2d 575, 584 (M.D.N.C. 2003). Where, however, the contracting parties "have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Here, the loan documents at issue contain a choice of law provision calling for the application of North Carolina law. [See Renewal

---

[6] Shirley Buafo signed the Charles Buafo Renewal Guaranty on behalf of Charles K. Buafo. The Buafos admit that Shirley Buafo was authorized by her husband to execute the Renewal Guaranty on his behalf. [Bank's Amended Answer and Counterclaims, Doc. 75 at ¶¶ 352, 353; Plaintiffs' Reply to Counterclaims, Doc. 76 at ¶¶ 352, 353].

Note, Doc. 7-4; S. Buafo Renewal Guaranty, Doc. 7-11; C. Buafo Renewal Guaranty, Doc. 7-13]. Accordingly, the Court will apply North Carolina law to the parties' contractual claims.

The parties appear to be in agreement that North Carolina law governs all of the Plaintiffs' non-contractual claims as well. The Court finds that application of North Carolina law is reasonable because the Bank is a North Carolina banking corporation, the property at issue is located in North Carolina, and the purchase transaction was completed here. <u>See</u> <u>Synovus Bank v. Coleman</u>, 887 F. Supp. 2d 659, 669-70 (W.D.N.C. 2012). Accordingly, the Court will apply North Carolina to all of the non-contractual claims asserted by the Plaintiffs.

**B.    The Plaintiffs' Claims**

   **1.    Count Two: Breach of Contract/Breach of Duty of Good Faith and Fair Dealing**

While couched both in terms of a breach of contract claim *and* a claim for a breach of the duty of good faith and fair dealing, Count Two of the Plaintiffs' Third Amended asserts only allegations of the latter. The Plaintiffs do not identify or assert any specific breach of contract in this Count.[7] The

---

[7] The Plaintiffs have asserted that the Bank committed a breach of contract as an affirmative defense to the Bank's counterclaims seeking to recover on the note and the guaranties. [Plaintiffs' Reply to Counterclaims, Doc. 76 at 37].

Plaintiffs' failure to assert a specific breach of contract claim, however, does not preclude them for asserting a claim for the breach of the duty of good faith and fair dealing. See Robinson v. Deutsche Bank Nat'l Trust Co., No. 5:12-cv-590-F, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013).

North Carolina law recognizes that "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 217, 675 S.E.2d 46, 57 (2009) (quoting Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 333 S.E.2d 299, 305 (1985)). Accordingly, "[a]ll parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose." Maglione v. Aegis Family Health Ctrs., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005). Here, the Plaintiffs contend that the Bank breached its duty of good faith and fair dealing under the Note, the Renewal Note, the guaranty agreements, and other related loan documents by: (1) requiring the Plaintiffs to engage Gravett as a general contractor as a general condition of obtaining the loan [TAC, Doc. 64 at ¶ 96]; (2) instructing Gravett to require the Plaintiffs to elect him as Manager of DFE [Id. at ¶ 97]; (3) paying Gravett unauthorized and

improper "kick-backs" [Id. at ¶ 106]; (4) making improper disbursements and improperly approving certain draw requests [Id. at ¶¶ 98-103]; (5) requiring the Plaintiffs to pledge additional collateral for the loan [Id. at ¶ 104]; (6) refusing to "fully renew the Note, as promised" [Id. at ¶ 105]; and (7) approving the sale of certain lots at the 2010 Sales Event conducted by RPM [Id. at ¶ 107]. The Court will address each of these contentions in turn.

### a. Requiring Plaintiffs to Involve Gravett in the Project

The Plaintiffs first assert that the Bank improperly controlled the business activities of DFE "through the compelled use of Gravett as a consultant." [Plaintiffs' Brief, Doc. 81 at 19]. The only evidence forecasted by the Plaintiffs to support this statement is Ms. Buafo's testimony that VanderWoude told her that "if you get Steve Gravett to develop the land, I will finance it for you." [S. Buafo Dep., Doc. 80-4 at 177].[8]

Taking Ms. Buafo's testimony as true for the purposes of this motion, the Plaintiffs' claim must fail as a matter of law. VanderWoude's statement to Ms. Buafo is insufficient to establish that the hiring of Gravett was, as

---

[8] This testimony is contradicted by the testimony of VanderWoude, who stated that there was no discussion of financing during the first meeting he had with the Buafos, and that neither he nor the Bank would have required a borrower to use a particular contractor as a condition to obtaining a loan. In assessing the Defendant's Motion for Summary Judgment, however, the Court must accept the Plaintiff's version of this meeting as true.

Plaintiffs argue, a "mandatory condition" of the loan [see Plaintiffs' Brief, Doc. 81 at 21]. Regardless of what VanderWoude said, however, the parol evidence rule provides that the terms of the parties' written agreement govern, and there is no such requirement found anywhere in the written loan documents. In any event, the Plaintiffs cannot cite to any evidence that Gravett did anything wrong or caused any harm to the Buafos or DFE. Therefore, even if the Bank had conditioned the loan on hiring Gravett, that would not be sufficient to state a claim against the Bank.

The Plaintiffs also allege that the Bank breached its duty of good faith and fair dealing by "instruct[ing] Gravett to require Plaintiffs to elect him as a" manager of DFE. [TAC, Doc. 64 at ¶ 97]. The Plaintiffs, however, have not presented any forecast of evidence that the Bank had input or involvement in this decision. And again, the Plaintiffs cannot cite to any evidence that Gravett did anything wrong or caused any harm to the Buafos or DFE; thus, even if the Bank had instructed Gravett to request that he be made the manager of DFE, that would not be sufficient to state a claim against the Bank.

For all of these reasons, the Bank's Motion for Summary Judgment as to the Plaintiffs' claim for breach of the duty of good faith and fair dealing

based on the Bank's alleged insistence on Gravett's involvement in the Project is granted.

**b.    Paying Kick-Backs to Gravett**

The Plaintiffs allege that the Bank failed to act in good faith when it paid Gravett and/or his companies "unauthorized and improper 'kick-backs.'" [TAC, Doc. 64 at ¶ 106].  The Plaintiffs have not presented any forecast of evidence, in connection with either their motion for partial summary judgment or in opposition to the Bank's motion for summary judgment, that Gravett or his related business entities received any "kick-backs" from the Bank. Accordingly, the Bank is entitled to summary judgment on this claim as well.

**c.    Improper Disbursements and Approval of Draw Requests**

The Plaintiffs also contend that the Bank failed to exercise good faith when it: (1) made improper disbursements/advancements under the Note without the Plaintiffs' "direct knowledge" or approval [TAC, Doc. 64 at ¶ 98]; (2) made disbursements/advancements in amounts that exceeded the then-current cost of construction [Id. at ¶ 99]; (3) authorized disbursements/advancements that it knew or had reason to know were not being used for the benefit of the Project [Id. at ¶ 100]; (4) knowingly approved and paid sub-contractors who had a direct relationship with the Bank and

who submitted higher bids and inflated invoices [Id. at ¶101]; (5) approved draw requests for expenses that "drastically exceeded" the Project's budget [Id. at ¶102]; and (6) approved draw requests for work that was not covered under the scope of work specified in the loan documents [Id. at ¶ 103].

While the Plaintiffs assert that the Bank breached its duty of good faith and fair dealing by approving draw requests that were improper, it is undisputed that the Bank funded the draws at the request of DFE's manager and agent, Gravett, and that such requests were authorized by the Plaintiffs. The Plaintiffs, therefore, have failed to demonstrate that any of the draw approvals were improper.

In addition to the allegedly improper draw requests, the Plaintiffs also alleged that Gravett used the money from the draw requests improperly. It is undisputed, however, that all of the funds from the draw requests -- with the exception of a few draw requests paid directly to subcontractors *at the direction of DFE* -- were deposited by the Bank into a checking account held in the name of DFE (the "Nantahala Account"). [Affidavit of Stephen Gravett ("Gravett Aff."), Doc. 106-2 at ¶¶ 18, 19]. Although Gravett prepared the checks, the Buafos signed every check written out of that account. [Id. at ¶ 20]. Gravett maintained separate accounts at Legacy Bank and Wachovia Bank, which were used as "field accounts" for the development. [Id. at ¶ 18].

The field accounts were funded by transfers from the Nantahala Account and deposits by the Buafos in the form of owner/equity contributions. [Id. at ¶ 21]. Gravett prepared, completed and signed the checks from the field accounts. [Id. at ¶ 22].

The North Carolina Uniform Fiduciaries Act provides, in pertinent part, as follows:

> If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith.

N.C. Gen. Stat. § 32-9. Here, the Plaintiffs have failed to produce any forecast of evidence to suggest that the Bank either had actual knowledge or willfully turned a blind eye to any improper actions of Gravett with respect to the subject draws.

The Plaintiffs' allegations regarding the making of improper loan disbursements assumes a contractual duty on the part of the Bank that simply did not exist.[9] North Carolina courts consistently have refused to

---

[9] Indeed, the May 28, 2010 Note expressly states that *DFE* would indemnify *the Bank* for any improper draw requests. [Original Note, Doc. 1-2 at 40 ¶ 3].

impose liability on a lender for purported losses resulting from a third party's alleged improper use of construction draws. See, e.g., Perry v. Carolina Builders Corp., 128 N.C. App. 143, 150, 493 S.E.2d 814, 818 (1997) ("in the absence of allegation of an express contractual provision between the instant parties requiring [the lender] to ensure application of the loan funds at issue to an agreed purpose, plaintiffs were owed no such legal duty"); Carlson v. Branch Banking and Trust Co., 123 N.C. App. 306, 313-14, 473 S.E.2d 631, 636 (1996) ("Though the statement of purpose in the loan agreement between defendant and [the bank] indicated that the loan was 'to fund the cost and expenses related to the acquisition of Ivy Management, Inc.,' this Court has previously held that such purpose statements are permissive and merely describe what the borrower may do with the money rather than giving rise to a lender's affirmative duty to a third party."), disc. review denied, 345 N.C. 340, 483 S.E.2d 162 (1997). Therefore, the Bank is entitled to summary judgment as to the Plaintiffs' claim based on the Bank's allegedly improper disbursements.

### d.    Requiring Additional Collateral

The Plaintiffs also allege that the Bank exercised bad faith by insisting that the Plaintiffs pledge their Florida property as additional collateral. [Doc. 64 at ¶ 104]. There is no forecast of evidence, however, that the Plaintiffs

were forced by any improper means into mortgaging the Florida property. Having advanced almost $5 million to the Plaintiffs, the Bank was entirely justified in seeking additional collateral from the Plaintiffs when the Plaintiffs threatened to default. While the Bank's demand may have presented a difficult choice to the Plaintiffs, the Bank's action cannot be said to have been a breach of its implied duty of good faith and fair dealing. The Bank's Motion for Summary Judgment as to this claim is granted.

### e. Failing to Renew Note

The Plaintiffs also claim that the Bank failed to exercise good faith by refusing to "fully renew" the Construction Loan "as promised." [TAC, Doc. 64 at ¶ 105]. Again, however, the Plaintiffs are attempting to impose obligations on the Bank beyond those contained in the Development Loan. The loan documents clearly state that the Bank promised only to fund the Project "up to the maximum total principal balance of $4,780,936.00 (Principal), plus interest." [Original Note, Doc. 7-1 at 2]. Other than agreeing to fund the Loan under to the maximum principal amount, the Original Note specifies that the Bank had "*no further obligations to make advances*" to DFE. [Id. (emphasis added)]. As the Plaintiffs' allegation does not pertain to any of the Bank's existing contractual obligations, their claim must be dismissed. See Southeast Brunswick Sanitary Dist. v. City of Southport, No.

COA09-1369, 2011 WL 340535, at *9 (N.C. Ct. App. Feb. 1, 2011) (noting that allegation of negotiating in bad faith regarding a new or amended agreement is insufficient to state breach of implied covenant of good faith and fair dealing claim because allegation did not pertain to existing contractual obligations).

To the extent that Plaintiffs are seeking to rely on an alleged oral promise to further fund the Project, such a claim also would be invalid, as it would be unenforceable under North Carolina's statute of frauds applicable to credit agreements.  See N.C. Gen. Stat. § 22-5; see e.g., Wachovia Bank, Nat'l Ass'n v. Preston Lake Homes, LLC, 750 F. Supp. 2d 682, 688 (W.D. Va. 2010) (holding that lender had no duty to exercise good faith to renew an acquisition and development loan, and that the borrowers' alternative argument of an implicit agreement to modify the loan agreements to ensure they would span the entire expected life of the development project also fails because it "runs afoul of the Virginia statute of frauds").  The Bank's Motion for Summary Judgment as to this claim is granted.

### f.    Approving Sale of Certain Lots

The Plaintiffs further contend that the Bank failed to exercise good faith when it approved the sale of certain lots at the Sales Event conducted by RPM.  [TAC, Doc. 64 at ¶ 107].  The Plaintiffs premise this claim on a

provision in the 2008 Commitment Letter (the "Release Provision")
concerning the release fees to which the Bank was entitled. The Release
Provision provides as follows:

> **MINIMUM PRINCIPAL REDUCTION AND
> RELEASE PROVISION:** A minimum principal
> reduction of $1,000,000 is required by 12/31/2009 in
> which lot sales will apply to that reduction. A release
> provision of 95% of net sales proceeds with a
> minimum principal reduction of $35,000 per acre will
> apply for deed releases.

[Commitment Letter, Doc. 91-1 at 381].

The Plaintiffs allege that the Bank improperly permitted a "deviation"
from the Release Provision in connection with the lot sales resulting from the
2010 Sales Event and therefore committed a breach of the Commitment
Letter. The forecast of evidence presented to the Court, however, does not
support this contention. In fact, the forecast of evidence demonstrates that
any "deviation" was done *at the behest of the Plaintiffs* through their agent,
Gravett. Ultimately, the Bank agreed to make a *concession* on the amount
of the release fees in order to allow the Sales Event to go forward. [See
Hawkins Dep., Doc. 91-1 at 170 ("it was better to make these concessions
and get some of the outstanding debt paid down as opposed to the project
just completely going belly up and we're sit[ting] with a development with no
sales")]. While many of the lots ended up being sold at the Sales Event for

less than the sales event pricing the Bank had approved prior to the sale, thereby jeopardizing the loan-to-value ratio necessary to comply with banking regulatory guidelines, the Bank decided to stay the course by approving the even lower release fees, thereby allowing the lot sales to close.

The Plaintiffs are correct that the Release Provision of the Commitment Letter was a term of the Original Loan.  It is precisely for this reason that Nantahala objected when Gravett, on behalf of DFE, made an agreement with RPM which conflicted with the Release Provision. The Plaintiffs are wrong, however, in asserting that the Bank's accommodation of their request to deviate from the contractual Release Provision is somehow a breach of the duty of good faith and fair dealing on the part of *the Bank*.  "[I]t is well settled that a contracting party may unilaterally waive a provision of the contract * * * which has been placed in the contract for that party's benefit." 13 Williston on Contracts § 39:24 (4th ed.) (footnotes omitted).  "To the extent that mutual assent might be requisite, when the term waived is beneficial solely to the party relinquishing its rights, the other's assent may be implied . . . ."  Id. (footnote omitted).  While the Plaintiffs contend the Release Provision was the Bank's contractual promise "to refrain from releasing its lien" [Plaintiffs' Brief, Doc. 81 at 3], this provision was for the Bank's benefit,

not the Plaintiffs'.  <u>See</u> <u>Camp v. Leonard</u>, 133 N.C. App. 554, 559-62, 515 S.E.2d 909, 913-14 (1999) (noting loan documents read as a whole make clear that the provision stating lender was authorized to disburse funds under its control in construction loan account only in proportion to its inspector's progress report was included to protect the lender's interest in the property and did not impose any contractual benefits on the borrower); <u>see also</u> <u>Wells v. N.C. Nat'l Bank</u>, 44 N.C. App. 592, 596-97, 261 S.E.2d 296, 299 (1980) (rejecting claims against bank based on failure to obtain insurance on property destroyed in fire, stating that the insurance requirement "was obviously for the benefit of [the bank]" and "in no way ma[de the bank] liable for plaintiff's losses").

In any event, the Plaintiffs voluntarily relinquished any rights they had under the Release Provision, when they through their agent, Gravett, asked the Bank to waive the terms of the Release Provision.  "A party who has intentionally relinquished the right to performance by the other party may not thereafter seek judicial enforcement of the contract with regard to the waived performance and loses any right to damages for the failure to perform." 13 <u>Williston on Contracts</u> § 39:15 (4th ed.) (footnotes omitted). Thus, even if the Plaintiffs had a contractual interest in the Release Provision, no cognizable claim can be based on those rights.

Moreover, the Plaintiffs through their subsequent actions ratified the lower release fees. Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Espinosa v. Martin, 135 N.C. App. 305, 308, 520 S.E.2d 108, 111 (1999), disc. rev. denied, 351 N.C. 353, 543 S.E.2d 126 (2000) (citation and quotation marks omitted). Ratification "may be express or implied, and intent may be inferred from failure to repudiate an unauthorized act . . . or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act." Id. at 309, 520 S.E.2d at 111 (citation and quotation mark omitted). Here, the Buafos signed sales contracts, closing statements, and Deeds of Trust; met with the Bank to discuss the loan-to-value issues with the Development Loan; executed the revised RPM Agreement; and expressly ratified that Agreement by a vote held at the Special Meeting of DFE's Members and Managers. These actions, at least implicitly, constitute a ratification of the lower release fees accepted by the Bank.

The Plaintiffs' claim is also barred by the second Debt Modification Agreement. The Plaintiffs entered into a Debt Modification Agreement on December 17, 2010 [Second Debt Modification, Doc. 91-1 at 410], which is

34

*after* both instances in which the Bank agreed to a variation of the Release Provision. This second Debt Modification Agreement expressly provides that the Borrower "waive[s] all claims, defenses, setoffs, or counterclaims relating to the Prior Obligation, or any document securing the Prior Obligation, that I may have." [Id.]. This Court has found similar contractual release language to be enforceable under North Carolina law. See, e.g., Synovus Bank v. Karp, 887 F. Supp. 2d 677, 690-91 (W.D.N.C. 2012). Thus, the Plaintiffs are foreclosed from pursuing this claim by their written release of that claim.

For all of the foregoing reasons, the Bank's Motion for Summary Judgment as to the Plaintiffs' claims for breach of the duty of good faith and fair dealing is hereby granted.

### 2. Fiduciary Claims

In Count Three of the Third Amended Complaint, the Plaintiffs allege that the Bank breached its fiduciary obligations to the Plaintiffs. [TAC, Doc. 64 at ¶¶ 129-30]. Specifically, the Plaintiffs allege that the Bank "was not only [a] lender but also . . . a financial and development advisor," and that this gave "rise to a special relationship of trust and confidence between [the] Bank and the Plaintiffs." [Id. at ¶ 128].

Under North Carolina law, it is well-established that "[a] fiduciary duty arises when there has been a special confidence reposed in one who in

35

equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 60, 418 S.E.2d 694, 699, disc. review denied, 332 N.C. 482, 421 S.E.2d 350 (1992) (internal quotation marks omitted). "However, an ordinary debtor-creditor relationship generally does not give rise to such a special confidence: [t]he mere existence of a debtor-creditor relationship between [the parties does] not create a fiduciary relationship." Id. at 61, 418 S.E.2d at 699 (alterations in original) (internal quotation marks omitted).

Here, the Plaintiffs assert that Ms. Buafo individually, and through Gravett, "placed a great deal of trust and confidence in the Bank in connection with the development of the Property." [Plaintiffs' Brief, Doc. 81 at 21]. The Plaintiffs further contend that Gravett had a close relationship with VanderWoude, that he referred to his relationship with VanderWoude as a "collaboration," and that he frequently sought VanderWoude's advice and counsel. [Plaintiffs' Brief, Doc. 81 at 19, 21, 23]. These assertions, however, do not amount to a forecast of evidence that the Plaintiffs placed the kind of confidence and trust in the Bank required for a finding of a fiduciary relationship. See First Sec. Bank v. Abel, 184 P.3d 318, 323 (Mont.

2008) (allegation that debtor and loan officer had a "close relationship" failed to raise a disputed issue of fact on fiduciary duty claim against lender).

Moreover, the forecast of evidence is undisputed that Ms. Buafo was capable of pursuing the project without VanderWoude or the Bank to guide her.  First Sec. Bank, 184 P.2d at 324 (dismissing claim for breach of fiduciary duty and noting that debtor had extensive legal background and thus "hardly would have needed the Bank to interpret the loan documents for her and to act as her advisor").  Here, Ms. Buafo was a sophisticated investor who had been developing the Property for over a year before she hired Gravett and before the Bank made the initial refinance loan to DFE.[10]

A party may not unilaterally place his or her trust in another party and thereby impose a fiduciary relationship on that other party which that other party did not accept.  See, e.g., Branch Banking & Trust Co., 107 N.C. App. at 61, 418 S.E.2d at 699 (holding borrowers' testimony that they reposed confidence and trust in the recommendations of the lender to be insufficient

---

[10] Ms. Buafo is an experienced business woman who served as the office administrator of her husband's cardiology practice while, at the same time, owning several independent businesses herself.  Ms. Buafo managed all of the Buafos' substantial financial, business, and investment interests, including multiple real estate investments.  She has a history of actively buying and selling real estate for profit, having taken college-level real estate and finance courses to prepare her for those investment activities, as well as having obtained a real estate license at one point just to see if she could pass the test.  [S. Buafo Dep., Doc. 80-4 at 126-48].

to sustain a claim for fiduciary duty). Rather, the lender must "know[ ] of and accept[ ] the borrower's trust." FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 102 (1st Cir. 2009). Here, there is no forecast of evidence that the Bank knowingly accepted Plaintiffs' purported trust and confidence so as to support the finding of a fiduciary relationship.

In any event, however, the Plaintiffs have failed to present a forecast of evidence that they were dominated and influenced by the Bank. See S. Atl. Ltd. P'Ship of Tenn., L.P. v. Riese, 284 F.3d 518, 533 (4th Cir. 2002) ("a fiduciary relation exists in fact [where] there is confidence reposed on one side, and resulting domination and influence on the other"). As one court has noted, "[c]ontrol does not exist simply because there is a great imbalance in bargaining power, as a borrower's primary lender invariably has significant leverage when it is on the brink of closing down a borrower's business. Control must be so overwhelming that there is a merger of identity or a domination of the borrower's will." In re Am. Consol. Transp. Cos., 433 Bankr. 242, 254 (Bankr. N.D. Ill. 2010) (citations omitted). Further, "control is not established when a lender insists on standard loan agreement restrictions, closely monitors the borrower's finances, and makes business recommendations, even [in] the context of heated negotiations." Id.

The Plaintiffs' forecast of evidence fails to satisfy this high burden here. The Plaintiffs argue that there was a joint venture between Gravett and VanderWoude such that Bank essentially controlled and dominated DFE through Gravett. [Plaintiffs' Brief, Doc. 81 at 19]. Notably, however, the Plaintiffs do not cite any North Carolina authority to support this joint venture theory. They rely instead on Wikipedia for their definition of a joint venture. [See Plaintiffs' Brief, Doc. 81 at 11 n.1]. Under North Carolina law, a joint venture requires, among other things, proof of a sharing of profits and losses, as well as the right to direct or control the conduct of the other party. See Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 403 (M.D.N.C. 2003). Here, the Plaintiffs have not presented any forecast of evidence to show that the Bank and Gravett jointly shared profits and losses or that either VanderWoude or the Bank had the right to control DFE's business.

The Plaintiffs also contend that the Bank's domination and control over DFE is shown by the Bank's "self-dealing" and/or "overreaching conduct." [Plaintiffs' Brief, Doc. 81 at 19]. First, the Plaintiffs contend that various subcontractors on the project had some familial relationship to VanderWoude, and that the Bank failed to disclose these relationships. [Plaintiffs' Brief, Doc. 81 at 11-12, 22-23]. The Plaintiffs have not presented

a forecast of evidence, however, to show that any of these subcontractors committed any malfeasance or were paid too much, or that the Bank had any input whatsoever as to which subcontractors were to be hired.  The fact that Gravett, as agent for DFE, may have selected some subcontractors with a familial relationship to VanderWoude, without more, does not support a claim of domination and control. At most, it supports an inference that Gravett trusted VanderWoude's recommendations or simply that Franklin, North Carolina is a small town.

The Plaintiffs also contend that various persons involved or otherwise associated with the Project were also Bank shareholders and that the Bank failed to disclose this to the Plaintiffs.  [Plaintiffs' Brief, Doc. 81 at 11-12, 22]. The Plaintiffs, however, do not cite any authority for the proposition that this constitutes evidence of improper influence and self-dealing on the part of the Bank.  Further, in the absence of a fiduciary relationship, the Bank owed the Plaintiffs no duty of disclosure.  See Watkins v. NCNB Nat'l Bank of Fla., N.A., 622 So. 2d 1063 (Fla. Dist. App. 1993) ("in the absence of a fiduciary relationship, NCNB's nondisclosure of material facts in an arm's length

transaction is not actionable misrepresentation unless NCNB employed an artifice or trick to prevent an independent investigation by Watkins").[11]

The Court concludes that the Plaintiffs' claim for breach of fiduciary duty must fail as a matter of law, as the Plaintiffs' forecast of evidence is insufficient to show that there was any fiduciary relationship between them and the Bank. This lack of a fiduciary relationship is likewise fatal to the Plaintiffs' claim for constructive fraud. Coleman, 887 F. Supp. 2d at 672. Therefore, for all of the foregoing reasons, the Defendant's Motion for Summary Judgment on the Plaintiffs' claims for breach of fiduciary duty and constructive fraud is granted.

### 3.    Negligent/Fraudulent Misrepresentation

In Count Four of the Third Amended Complaint, the Plaintiffs assert a claim of "negligent/fraudulent misrepresentation" against the Bank. Specifically, they contend that the Bank negligently or fraudulently misrepresented to them "that [the Bank] would fully renew the Note, with additional advances, to allow Plaintiffs to complete development of the

---

[11] In arguing that a fiduciary relationship existed, the Plaintiffs also point to the fact that VanderWoude referred at his deposition to Nantahala's relationship with Plaintiffs as being a "fiduciary" one. [VanderWoude Dep., Doc. 80-4 at 74]. VanderWoude's characterization, however, is not a binding legal admission on the part of the Bank, especially considering that VanderWoude explained in his deposition that when he used the word "fiduciary," he was merely referring to the fact that the Buafos were the Bank's customers. [Id. at 75].

Project if Plaintiffs agreed to pledge the Florida Property as additional collateral for the loan."  [TAC, Doc. 64 at ¶ 132].

To prove a claim for fraud in North Carolina, a plaintiff must demonstrate: (1) a material misrepresentation of a past or existing fact; (2) that the representation was definite and specific; (3) that it was made "with knowledge of its falsity or in culpable ignorance of its truth"; (4) that the misrepresentation was made with the "intention that it should be acted upon"; (5) that the recipient of the misrepresentation reasonably relied and acted upon the misrepresentation; and (6) that the misrepresentation resulted in damage to the recipient.  Horack v. So. Real Estate Co. of Charlotte, Inc., 150 N.C. App. 305, 313, 563 S.E.2d 47, 53 (2002).

Here, the Plaintiffs assert that the Bank fraudulently represented that it *would* renew the Development Loan if certain additional collateral was pledged.  The record, however does not contain any forecast of evidence that such a statement was actually made to the Plaintiffs.  Even assuming that such a statement was made, however, it is nevertheless not actionable because it is merely a promissory representation.  Under North Carolina law, a promissory representation (i.e., a promise to do a certain act in the future) can serve as a basis for a fraud claim, even though it does not constitute the representation of a subsisting fact, only if "there is evidence of scienter

tending to show that the promisor intended to deceive and had no intention of performing the promise at the time he made it." Synergy Financial, L.L.C. v. Zarro, 329 F.Supp.2d 701, 711 (W.D.N.C. 2004) (citation omitted). The Plaintiffs have not presented a forecast of evidence to demonstrate that the Bank had no intention of renewing the loan agreement at the time that the alleged representation was made.

The Plaintiffs' alternative claim for negligent misrepresentation also fails. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Dallaire v. Bank of Am., N.A., 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014) (citation omitted). The Plaintiffs have failed to present a forecast of evidence that the Bank negligently supplied information for the guidance of the Plaintiffs. Moreover, because the Court has concluded that no fiduciary relationship existed between the parties, the Plaintiffs have failed to present a forecast of evidence to establish that the Bank owed them any duty of care.

For these reasons, the Bank's Motion for Summary Judgment on the Plaintiffs' claim for negligent/fraudulent misrepresentation is also granted.

### 4. Chapter 75 Claim

In Count Five of the Third Amended Complaint, the Plaintiffs assert a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 ("Chapter 75 claim"). Other than generally referencing the acts "set forth above" [TAC. Doc. 64 at ¶ 142] in connection with their contractual and non-contractual claims, the Plaintiffs do not specifically identify which acts or practices of the Bank serve as the basis for their Chapter 75 claim. Because the Court has concluded that the Plaintiffs' substantive claims all fail as a matter of law, the Plaintiffs' Chapter 75 claim will be dismissed as well.

### 5. Declaratory and Injunctive Relief

The Plaintiffs also assert a claim for a declaratory judgment discharging the Buafos as guarantors and releasing the Plaintiffs' collateral (Count Six) and a "claim" for injunctive relief to prevent the Bank from enforcing the Renewal Note and the Guaranties (Count Eight).

Both of these "claims" must be dismissed. The Plaintiffs' request for an award of injunctive relief is not in and of itself a cause of action. It is a remedy, not a claim giving rise to a remedy.[12] Further, the Plaintiffs'

---

[12] The Plaintiffs' "claim" for punitive damages (Count Seven) fails for this reason as well. See Baldwin v. Duke Energy Corp., No. 3:12cv212, 2012 WL 3562402, at *2 (W.D.N.C. Aug. 17, 2012).

declaratory judgment claim, being based on the same allegations regarding the Bank's past wrongs, is simply duplicative of the Plaintiffs' other causes of action.

For all of these reasons, the Court finds that there are no genuine disputes as to any material fact, and that the Bank is entitled to judgment as a matter of law as to all of the Plaintiffs' claims. Accordingly, the Plaintiffs' Motion for Partial Summary Judgment will be denied, and the Bank's Motion for Summary Judgment with respect to the Third Amended Complaint will be granted.

### C. The Bank's Counterclaims

In its Amended Counterclaims, the Bank seeks to recover under the Renewal Note and the Guaranties. The Bank also seeks an award of attorneys' fees. In defense of the Bank's Amended Counterclaims, the Plaintiffs assert defenses of breach of contract and repudiation. The Court will address each of these claims and defenses in turn.

### 1. Plaintiffs' Affirmative Defense of Breach of Contract

The Plaintiffs' Eighth Defense to the Bank's Amended Counterclaims asserts the defense of breach of contract arising from the Bank's breach of the Release Provision, as described in Section IV.B.1.f. above. For the reasons stated herein, the Court concludes that summary judgment in favor

of the Bank is appropriate as to the alleged breach of the Release Provision. Accordingly, for these same reasons, the Plaintiffs' Eighth Affirmative Defense also fails.

In their Motion for Partial Summary Judgment, the Plaintiffs alternatively contend that they are entitled to summary judgment with respect to their Eight Affirmative Defense under the theory of breach of contract by anticipatory repudiation.[13] [Plaintiffs' Brief, Doc. 81 at 16].

As the North Carolina Court of Appeals has explained:

> Repudiation is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties. * * * For repudiation to result in a breach of contract, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute[.] Furthermore, even a distinct, unequivocal, and absolute refusal to perform is not a breach unless it is treated as such by the adverse party. Upon repudiation, the non-repudiating party may at once treat it as a breach of the entire contract and bring his action accordingly. Thus, breach by repudiation depends not only upon the statements and actions of the allegedly repudiating party but also upon the response of the non-repudiating party.

---

[13] Notably, the Plaintiffs did not plead this particular theory in their Reply to the Bank's Counterclaims. However, because the Bank addressed the Plaintiff's repudiation theory in its pleadings, the Court will proceed to address it as well.

<u>D.G. II, LLC v. Nix</u>, 211 N.C. App. 332, 338-39, 712 S.E.2d 335, 340-41 (2011) (internal citations and quotation marks omitted).

In making their repudiation argument, Plaintiffs overlook the fact that the Bank fully performed on its primary obligation under the Development Loan by loaning Plaintiffs close to five million dollars.  Thus, the Bank never repudiated "the whole contract" or "a covenant going to the whole consideration."   Further, the Bank never made a "distinct, unequivocal, and absolute refusal to perform" under the contract.  Finally, the Plaintiffs' own conduct in treating the contract as on-going, and even entering into the Renewal Note at a later date, demonstrates unequivocally that the Plaintiffs did not treat the Bank's concessions on the release fees as a breach of contract; indeed, the Plaintiffs continued to treat the Development Loan as a binding contract even after the Bank's alleged "repudiation." Given the undisputed forecast of evidence, the Court concludes that the Plaintiffs' repudiation argument is entirely without merit.

## 2.    Recovery under the Note

Having determined that the Plaintiffs' defenses fail as a matter of law, the Court now turns to the substance of the Bank's Amended Counterclaims.

Under North Carolina law, the holder of a negotiable instrument may enforce payment in its own name.  N.C. Gen. Stat. § 25-3-301.  The "holder"

of an instrument is one who is (a) "in possession" (b) "of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession."  N.C. Gen. Stat. § 25-1-201(b)(21).

Here, the Bank has established that a true and correct copy of the Renewal Note has been presented, that Shirley Buafo executed the Renewal Note on behalf of DFE, that Charles Buafo executed the Renewal Note on behalf of DFE, and that Diamond Falls Estates is in default under that Note. Moreover, the Bank has established that it has possession of the Renewal Note, that Nantahala is the named payee on that Renewal Note, and that the Renewal Note has not been endorsed, transferred or assigned.  Moreover, the Plaintiffs have presented no forecast of evidence countering any of the elements of the Bank's Counterclaims.  Accordingly, the Court concludes that the Bank has established as a matter of law its right to recover amounts due from DFE pursuant to the terms of the Renewal Note.

### 3.    Recovery under the Guaranties

The liability of the Buafos for amounts due under the Renewal Note is premised on the Guaranties they signed.  Those Guaranties provide, in pertinent part, as follows:

> For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce your forbearance with respect to any Debt,

or to induce you to extend and/or maintain credit, or grant any other financial accommodation, I absolutely and unconditionally agree to all terms of and guaranty to you the payment and performance of each and every Debt, of every type, purpose and description that the Borrower either individually, among all or a portion of themselves, or with others, may now or at any time in the future owe you, including, but not limited to **the following described Debt(s)** including without limitation, all principal, accrued interest, attorneys' fees and collection costs, when allowed by law, that may become due from the Borrower to you in collecting and enforcing the Debt and all other agreements with respect to the Borrower.

> A promissory note or other agreement, No. 106391R, dated June 10, 2011, from the Diamond Falls Estates, LLC (Borrower) to you, in the amount of $2,644,266.80.

[Guaranties, Docs. 7-11 and 7-13]. By their express terms, the Guaranties signed by the Buafos extend to and guarantee the Renewal Note. North Carolina courts will enforce contractual guaranty obligations according to their terms. See Jennings Comms. Corp. v. PCG of Golden Strand, Inc., 12 N.C. App. 637, 641, 486 S.E.2d 229, 232 (1997). Moreover, the Plaintiffs have presented no forecast of evidence countering any of the elements of the Bank's claim of recovery under the Guaranties. Accordingly, the Buafos are liable for the amounts due under the Renewal Note, per the plain terms of their Guaranties.

## 4.    Recovery of Attorneys' Fees

In addition to the recovery of the outstanding indebtedness, the Bank also seeks to recover its reasonable attorneys' fees incurred in this action to enforce the Note and the Guaranties.  Under North Carolina law, a party generally cannot recover attorneys' fees "unless such a recovery is expressly authorized by statute."  Stillwell Enters., Inc. v. Interstate Equip. Co., 300 N.C. 286, 289, 266 S.E.2d 812, 814 (1980).  Section 6-21.2 of the North Carolina General Statutes allows for an award of attorneys' fees in actions to enforce obligations owed under a promissory note or other "evidence of indebtedness" that itself provides for payment of attorneys' fees.  That section provides, in pertinent part, as follows:

> Obligations to pay attorneys' fees upon any note, conditional sale contract or other evidence of indebtedness, in addition to the legal rate of interest or finance charges specified therein, shall be valid and enforceable, and collectible as part of such debt, if such note, contractor other evidence of indebtedness be collected by or through any attorney at law after maturity....

N.C. Gen. Stat. § 6-21.2.

In the present case, DFE agreed to the payment of the Bank's collection costs, including attorneys' fees, under the express terms of the Renewal Note:

> COLLECTION EXPENSES AND ATTORNEYS'
> FEES…. I agree to pay all expenses of collection,
> enforcement or protection of your [the Bank's] rights
> and remedies under this Note or any other Loan
> Document.  Expenses include, but are not limited to,
> reasonable attorneys' fees not exceeding 5 percent
> of the outstanding balance of this Note.

[Renewal Note, Doc. 7-4].

Similarly, Shirley Buafo and Charles Buafo agreed to pay the Bank's

collection expenses and reasonable attorneys' fees under the express terms

of their respective guaranties:

> COLLECTION EXPENSES AND ATTORNEYS'
> FEES. On or after the occurrence of an Event of
> Default, to the extent permitted by law, I agree to pay
> all expenses of collection, enforcement or protection
> of your rights and remedies under this Guaranty and
> any other document relating to the Debt. To the
> extent permitted by law, expenses include, but are
> not limited to, reasonable attorneys' fees, court costs
> and other legal expenses.

[Guaranties, Docs. 7-11 and 7-13].

Under North Carolina law, a creditor is required to notify all parties

sought to be held on the obligation that the creditor will seek to enforce the

attorneys' fees provision contained in the note or other evidence of

indebtedness and that if the party pays the outstanding balance within five

days from the mailing of such notice, then the attorneys' fee obligation shall

be void.  N.C. Gen. Stat. § 6–21.2(5).  The undisputed forecast of evidence

demonstrates that the Bank has complied with this provision. Prior to the filing of this lawsuit, Nantahala provided written notice to DFE and the Buafos of the outstanding balance on the Renewal Note, and further notified them that the Bank would seek to recover attorneys' fees in addition to the outstanding balance of the debt, pursuant to the provisions of the Renewal Note and the Guaranties unless DFE and/or the Buafos paid the outstanding balance of the debt within five (5) days from the mailing of the notice. The Bank's notification specifically informed DFE and the Buafos that if they paid the outstanding balance in full before the expiration of the five (5) days, then they would not be liable for the Bank's reasonable attorneys' fees. [See Reffit Aff., Doc. 96-1 at ¶ 39]. DFE and the Buafos, however, failed to pay the outstanding balance of the debt within the time specified. Accordingly the Court concludes that the Bank is contractually entitled to recover its reasonable attorneys' fees, not to exceed five percent (5%) of the outstanding loan amount at the time the Original Answer and Counterclaims were filed on March 7, 2014.[14]

The Court is unable to discern from the present record what amount of "reasonable" fees the Bank incurred in collecting, enforcing or protecting its

---

[14] As of that date, five percent of the outstanding loan amount was $128,977.47. [Reffit Aff., Doc. 96-1 at ¶ 41].

rights and remedies under the Renewal Note or the Guaranties. Accordingly, the Court will allow the Bank fourteen (14) days to supplement the record regarding its claim for attorneys' fees.

### D. **Daubert Motions**

Because the Court has determined that summary judgment is warranted in favor of the Bank, and the resolution of such issues did not require consideration of any of the proffered expert testimony, the Court need not address the parties' motions seeking to exclude and/or limit the testimony of the experts designated in this case. Accordingly, the parties' respective Daubert motions will be denied as moot.

## V. CONCLUSION

For the foregoing reasons, the Bank's Motion for Summary Judgment on its Amended Counterclaims is granted, and the Plaintiffs' Motion for Partial Summary Judgment is denied. The Court will enter judgment in favor of the Bank against the Plaintiffs, jointly and severally, as follows: the amount of $2,725,989.42 through and including March 27, 2015, with interest continuing to accrue at a rate of $366.53 per day beginning on March 28, 2015, and interest accruing at the legal rate after entry of the judgment, plus attorney fees in an amount to be determined but in any event not to exceed

five percent (5%) of the outstanding loan amount at the time the Original Answer and Counterclaims were filed on March 7, 2014.

## O R D E R

**IT IS, THEREFORE, ORDERED** that:

(1) Plaintiffs' Motion for Partial Summary Judgment [Doc. 77] is **DENIED**;

(2) Defendant Nantahala Bank & Trust Company's Motion for Summary Judgment on Nantahala's Counterclaims [Doc. 95] is **GRANTED**, and a judgment shall be entered against the Plaintiffs and in favor of the Defendant Nantahala Bank & Trust Company in the amount of $2,725,989.42 through and including March 27, 2015, with interest continuing to accrue at a rate of $366.53 per day beginning on March 28, 2015, and interest accruing at the legal rate after entry of the judgment, plus attorney fees in an amount to be determined but in any event not to exceed five percent (5%) of the outstanding loan amount at the time the Original Answer and Counterclaims were filed on March 7, 2014;

(3) Defendant Nantahala Bank & Trust Company's Motion for Summary Judgment on Plaintiffs' Third Amended Complaint

[Doc. 98] is **GRANTED**, and the Plaintiffs' claims against the Defendant Nantahala Bank & Trust Company are hereby **DISMISSED WITH PREJUDICE**;

(4)     Plaintiffs' Motion to Exclude Certain Opinion Testimony of Roy Strickland [Doc. 102] and Defendant Nantahala Bank & Trust Company's Motion in *Limine* to Exclude Plaintiffs' Damages Expert [Doc. 104] are **DENIED AS MOOT**; and

(5)     The Bank shall have fourteen (14) days to supplement the record regarding its claim for attorneys' fees.

A Judgment shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: September 7, 2015

Martin Reidinger
United States District Judge